## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 3:20-CR-098-RAH-SMD |
| | ) | |
| JIMMIE LEE ALLEN, IV | ) | |

### RECOMMENDATION OF THE MAGISTRATE JUDGE

Defendant, Jimmie Lee Allen, IV ("Allen"), is charged in a one-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 12). The federal charge arises from a pistol that police discovered hidden in Allen's crotch when they searched him incident to arrest on state arrest warrants. Allen moves to suppress the firearm and all incriminating statements made following his arrest. Def.'s Mot. to Suppress (Doc. 24). He argues that the state arrest warrants were invalid, that the arresting officer lacked probable cause, and that the state magistrate who issued the arrest warrants was not neutral and detached. *Id.* The undersigned held an evidentiary hearing on October 20, 2020. For the reasons that follow, the undersigned RECOMMENDS that Allen's Motion to Suppress be DENIED in its entirety.

### I.    LEGAL STANDARDS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV. When police lawfully seize a defendant pursuant

to an arrest warrant, they may lawfully search his person incident to arrest without separate suspicion. *See United States v. Robinson*, 414 U.S. 218, 225-27 (1973). A defendant seeking to suppress evidence seized pursuant to a warrant bears the burden of proving that the warrant lacks probable cause. *Batten v. United States*, 188 F.2d 75, 77 (5th Cir. 1951);[1] *United States v. Wentworth*, 446 F. Supp. 3d 1302, 1307 (M.D. Ga. 2020) (explaining that, "[g]enerally, a defendant moving to suppress evidence seized pursuant to a warrant bears the initial burdens of production and persuasion").

## II.     FINDINGS OF FACT

At approximately 5:00 a.m. on June 3, 2019, Investigator Jonathan Caldwell ("Inv. Caldwell") of the Roanoke, Alabama, Police Department began to investigate an armed robbery and attempted murder that occurred earlier that morning at 135 Dallas Circle. Tr. (Doc. 50) 20, 42. Angelica Carr ("Angelica") and her husband, Cornelius Carr ("Cornelius"), lived at that address, and they were rumored to sell drugs from the house. Tr. (Doc. 46) 8, 42.

Angelica informed Inv. Caldwell that shortly before midnight, she drove to the Circle K convenience store where she saw Willie McFarland ("McFarland"). Def.'s Ex. 12, Angelica Carr Statement (Doc. 48-2) at 23; Tr. (Doc. 46) at 16-20. McFarland was walking and asked for a ride, and she agreed to take him as far as her house. *Id.* When Angelica pulled up to her house, two armed men wearing masks accosted them. *Id.* The

---

[1] Former Fifth Circuit opinions issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

men said, "Roanoke PD, get down," but Angelica could see they were not police. *Id.* One man who had dreadlocks struck Willie in the head with his gun, and Willie fought with him and was able to run away. *Id.* The man with the dreadlocks then came to Angelica's side of the truck and held a gun to the back of her head. *Id.* The other man snatched Angelica's phone and keys from her hand and reached into her shirt and pulled money, $600 in $50 bills, from her bra. *Id.* He passed all of Angelica's things to the other man and demanded to know which key was the house key. *Id.* Angelica told him she didn't have a house key, and that she had to call Cornelius to get into the house. *Id.* The man told her to call Cornelius, but she couldn't because he had taken her phone. *Id.* The man then pulled out a phone and asked for Cornelius's number. *Id.* Before he dialed, he shoved the gun in Angelica's mouth and told her that, if she didn't say exactly what he told her, he would blow her brains out. *Id.* He then dialed Cornelius's number, which Angelica had provided, and handed her the phone. *Id.* Cornelius answered, but because he didn't recognize the number, he got angry with Angelica and asked whose phone it was. *Id.* She lied and said it was her cousin's and told him to open the door and let her inside. *Id.*

While the man with dreadlocks remained with his gun to the back of Angelica's head, the one who handed her the phone went to the door. *Id.* When Cornelius cracked the door open, the gunman fired two shots into the house. *Id.* Cornelius turned and ran down the hallway to a back bedroom. *Id.* The gunman entered the house, fired another shot at Cornelius, and then turned around and ran out of the house. *Id.* None of the shots hit Cornelius. The man who stayed outside with Angelica ran away as soon as the first

3

shots were fired. *Id.* After the two gunmen fled, Angelica and Cornelius called the police. *Id.*

At approximately 3:00 a.m., after the police had left, Cornelius began receiving threatening text messages from the same phone number that Angelica had used to call him during the robbery. Def.'s Ex. 8, Search Warrant Aff. (Doc. 48-2) at 16; Tr. (Doc. 46) at 20-25. The texts instructed him to put $60,000 at an abandoned house on Riley Street before 8:00 a.m. or they would kill his mother. *Id.* Cornelius called the police again, and it was at this point that Inv. Caldwell became involved in the investigation. *Id.* He interviewed Cornelius and Angelica, and then made an emergency information request to Verizon in an attempt to identify who was sending the texts. *Id.*

Verizon informed Inv. Caldwell that the phone was a prepaid cell phone purchased at the Dollar General in Lafayette, Alabama, so there was no subscriber information. *Id.* These prepaid phones are commonly called "burner" phones. *Id.* Verizon provided Inv. Caldwell all texts sent or received by that phone in the previous few days, and the numbers for all incoming and outgoing voice calls for the same period. *Id.* Verizon provided this emergency information almost immediately. *Id.*

Verizon's information showed the threatening texts to Cornelius and the outgoing call Angelica made to Cornelius during the robbery. Def.'s Ex. 8, Search Warrant Aff. (Doc. 48-2) at 16; Tr. (Doc. 46) at 23-25. It also showed outgoing calls to two other numbers. *Id.* Inv. Caldwell showed the unidentified numbers to Angelica, and she compared them to the contacts on her cell phone and identified one of them as belonging

to Kantavious Trammell ("Trammell").  Tr. (Doc. 46) at 24.  Roanoke Police also ran the number through the U.S. Marshals Service and confirmed that it was registered to Trammell.  Def.'s Ex. 8, Search Warrant Aff. (Doc. 48-2) at 16.  In addition to the outgoing call to Trammell, Verizon's information showed an incoming text from Trammell just before the robbery saying, "He on his way now," and another the morning after the robbery saying, "He talking bout it will be later."  *Id.*  Based upon this evidence, Inv. Caldwell believed that Trammel was involved in the robbery, and he obtained a search warrant for Trammell's person and phone.  Def.'s Ex. 8, Search Warrant (Doc. 48-2) at 14-17.

Inv. Caldwell and two other officers executed the warrant immediately.  Tr. (Doc. 46) at 26.  They found Trammell where he lived at his girlfriend's apartment.  (Doc. 48-2) at 17; Tr. (Doc. 46) at 45.  Trammell made a statement and told Inv. Caldwell that he had been at Angelica and Cornelius's house buying marijuana when he received a call from the burner phone.  Tr. (Doc. 46) at 27-28.  Trammell told them the caller was Pierce McGuire ("Pierce"), asking who was in the house because they were getting ready to go inside.  *Id.* at 28-29; Def.'s Ex. 10, Trammell Statement (Doc. 48-2) at 18.  Trammell claimed that he did not want them to rob Angelica, so he lied and told him that other people were in the house.  *Id.*  When he got home, he saw Cornelius leaving the trailer park, and he texted Pierce.  Tr. (Doc. 46) at 29-30.  He stated that he was warning Pierce that Cornelius was returning so they would not go in and rob Angelica.  *Id.*

At first, Trammell denied any knowledge of the robbery.  *Id.* at 47.  He then changed his story and told Inv. Caldwell that earlier that morning, Pierce came to his house and told

5

him that he and Jimmy Allen ("Allen") had just robbed Angelica and Cornelius. Tr. (Doc. 46) at 30, 47-49; Def.'s Ex. 10, Trammell Statement (Doc. 48-2) at 18.  Pierce told Trammell that Allen held Angelica at gunpoint while he went into the house and that he shot at Cornelius four times.  Def.'s Ex. 10, Trammell Statement (Doc. 48-2) at 18.  Pierce was present in Trammell's girlfriend's apartment at the time of the interview.  Tr. (Doc. 46) at 45.  Inv. Caldwell suspected that Trammell may have been one of the gunmen, but Angelica knew him personally and was "100 percent sure" that he was not one of the robbers.  Tr. (Doc.46) at 59.  Roanoke Police found a loaded 9mm pistol, two bags of suspected marijuana, and a bag of suspected cocaine when they executed the search warrant on Trammel, and they arrested him.  *Id.* at 46; (Doc. 48-2) at 17.

With Trammell identifying the two gunmen, Inv. Caldwell sought arrest warrants for Pierce and Allen on June 4, 2019, the day after the robbery.  Tr. (Doc. 46) at 36-37. Randolph County uses a web-based system, developed by the Alabama Unified Judicial System, for officers to obtain arrest warrants known as E-Warrants.  *Id.* at 66.  A complaining officer applying for an arrest warrant enters identifying information concerning the defendant and the victim, and the proposed charges into the E-Warrant system, and the system generates a draft complaint to Chris May, the Chief Magistrate of Randolph County, for his review.  *Id.* at 64-66.  May relies entirely upon an officer's sworn testimony when determining whether a warrant is supported by probable cause.  *Id.* at 73. The officers do not submit affidavits for arrest warrants.  *Id.* at 40, 58, 73.  Based upon Inv. Caldwell's sworn testimony, May determined that there was sufficient probable cause to

support the warrant for Pierce, but insufficient probable cause for the warrant for Allen. *Id.* at 36-37, 69-70, 72. He issued an arrest warrant for Pierce, and Pierce turned himself in to the Sheriff's Department. *Id.* at 54.

Inv. Caldwell continued his investigation and spoke with Chief Magistrate May concerning the type of evidence he needed to establish probable cause to charge Allen. *Id.* at 69-70, 72. He interviewed Angelica's brother, Deshun McGuire ("Deshun"), on June 20, 2019. Gov't's Ex. 3, Deshun McGuire Statement, (Doc. 48-4) at 26. Deshun stated that about a week before the robbery, Allen contacted him through Facebook Messenger asking where Cornelius kept his money. *Id.*; Tr. (Doc. 46) at 34. Allen also stated that he would give Deshun some money if they got some. *Id.* Deshun and Allen were friends, and Allen knew that Deshun had lived with Angelica and Cornelius in the past. *Id.* Deshun told Allen that he didn't know where Cornelius hid his money. *Id.* Allen also asked Deshun if Cornelius had a "findi" (i.e., Fendi) bag, and Deshun confirmed that he did, but said he didn't know what was in it. *Id.* With this additional evidence implicating Allen, Inv. Caldwell went back to Chief Magistrate May, and he signed two criminal complaints and issued arrest warrants for Allen on July 1, 2019. Def.'s Exs. 1-4 (Doc. 48-2) at 2-8. The first complaint charged Allen with attempted murder and discharge of a gun into an occupied building or vehicle. *Id.* at 1-4. The second charged him with 1st degree robbery. *Id.* at 5-8.

After he secured the arrest warrants, Inv. Caldwell began looking for Allen at the Budget Inn where he was believed to be staying. Tr. (Doc. 46) at 40. He saw Allen leave

the motel parking lot in a white BMW and pull into the Quality Quick Lube parking lot. *Id.* at 40-41; (Doc. 48-2) at 11.  Allen exited the BMW and walked toward the garage bay doors, and Inv. Caldwell placed him under arrest. *Id.*  He handcuffed Allen, searched him incident to arrest, and found a large amount of money in his pockets. *Id.*  He then handed Allen over to another officer for transport. *Id.*  That officer more thoroughly searched Allen incident to arrest before placing him in his patrol car, at which time he discovered a Taurus .40 caliber G2C pistol hidden in the crotch of Allen's pants. *Id.*  Allen gave a statement saying that he purchased the gun at a flea market for protection because Cornelius had ordered him killed because of the robbery.  Def.'s Ex. 7, Allen Statement (Doc. 48-2) at 13.

## III.  ANALYSIS

### A.  Probable Cause

The plain text of the Fourth Amendment prohibits issuance of an arrest warrant without a finding of probable cause supported by oath or affirmation.  U.S. CONST. AMEND. IV.  Probable cause exists when there are "facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (quoting *Becks v. Ohio*, 379 U.S. 89, 91 (1964)).  The Fourth Amendment requires only "a reasonable ground for belief of guilt" and "that the belief of guilt . . . be particularized with respect to the person to be . . . seized." *Maryland v. Pringle*, 540 U.S. 366, 372 (2003) (internal quotes and citations omitted). Probable cause "is a practical, nontechnical conception that deals with the factual and

8

practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* It is a "radically different standard than 'beyond a reasonable doubt'" and "the arresting officer need not have in hand sufficient evidence to convict." *United States v. Pantoja-Soto*, 739 F.2d 1520, 1524 n.7 (11th Cir. 1984) (internal quotes and citation omitted).

In his moving papers, Allen argues that his arrest warrants were invalid because they lacked facts or an incorporated affidavit establishing probable cause. Def.'s Mot. to Suppress (Doc. 24) at 3-5. The Court agrees that the complaints and warrants for Allen do not establish probable cause within their four corners. However, a federal court reviewing a State warrant may also consider an officer's oral testimony, "which is sworn before the issuing magistrate, in determining whether the warrant was founded on probable cause." *United States v. Hill*, 500 F.2d 315, 320 (5th Cir. 1974*); see also, Wallace v. Smith*, 297 F. App'x 915, 916 (11th Cir. 2008) (unpublished table opinion) (same).

It was established at the hearing that the District Court of Randolph County relies entirely upon officers' unrecorded sworn oral testimony in making probable cause determinations on arrest warrants. While this procedure is less than ideal because it deprives a reviewing court of any meaningful record, it is constitutionally permissible, and Allen concedes this point. Tr. (Doc. 46) at 74-75. Therefore, the undersigned must look to the evidence that Inv. Caldwell orally presented to Chief Magistrate May to determine if there was probable cause to support the arrest warrants.

9

Caldwell's evidence against Allen consisted entirely of Trammell's and Deshun's statements. *See* Trammell Statement, Def.'s Ex. 10 (Doc. 48-2); Gov't's Ex. 3, Deshun McGuire Statement, (Doc. 48-4). Trammell stated that Pierce told him how he and Allen had robbed Cornelius and Angelica. Trammell Statement, Def.'s Ex. 10 (Doc. 48-2) at 18. Trammell explained that Allen held Angelica at gunpoint while Pierce went into the house and shot at Cornelius four times. *Id*. Allen and Pierce then took off running through the woods. *Id.* These specific details closely match Angelica's description of the robbery. *See* Def.'s Ex. 12, Angelica Carr Statement (Doc. 48-2) at 23. Trammell gave his statement the day of the robbery, and he could not have known these specific details unless he was present during the robbery or told about it by someone who was.

Angelica stated that she was "100 percent sure" that Trammell was not one of the gunmen. Tr. (Doc.46) at 59. Accordingly, Trammell's statement accurately describing the specific details of the robbery that occurred earlier that morning has strong indicia of reliability. One of the robbers must have given Trammell the details. In addition, Trammell's voice calls and texts to and from the burner phone used during the robbery establish that he had a relationship with at least one of the robbers, giving him a basis of knowledge that further corroborates his statement.

Deshun, Angelica's brother, stated that Allen messaged him asking where Cornelius kept his money and promising to give him some if they got it. Gov't's Ex. 3, Deshun McGuire Statement, (Doc. 48-4). Allen sent this message approximately one week before the robbery. *Id.* Allen knew that Deshun had lived with Cornelius and was familiar with

10

the house. Deshun's statement is strong evidence that Allen planned to rob Cornelius. It is completely independent from Trammell's statement, and further implicates Allen in the robbery. Inv. Caldwell reported these facts and circumstances to Chief Magistrate May orally, under oath., and they are sufficient to cause a reasonably prudent person to conclude that Allen participated in the robbery. The probable cause standard is not onerous. Two independent witnesses implicated Allen in the robbery. Accordingly, the State arrest warrants for Allen were supported by probable cause.

### B. *Leon* Good Faith Exception

Even if the evidence presented by Inv. Caldwell to Chief Magistrate May was insufficient to establish probable cause, the firearm seized from Allen incident to arrest and his subsequent statement are nevertheless admissible under the good faith exception to the exclusionary rule recognized in *United States v. Leon*, 468 U.S. 897, 905-25 (1984). In *Leon*, the Supreme Court explained that the exclusionary rule is not a necessary corollary to the Fourth Amendment or a personal right of aggrieved, but rather "a judicially created remedy designed to safeguard Fourth Amendment rights . . . through its deterrent effect . . . ." *Id.* at 906 (internal quotes and citation omitted). The exclusionary rule is designed to deter unconstitutional police misconduct and has no utility when an officer acts in good faith to obtain an arrest warrant from a judge or magistrate. *Id.* at 916. The exclusionary rule is not intended "to punish the errors of judges and magistrates." *Id.*

A warrant serves as a reliable safeguard against improper searches and arrests because it requires "the detached scrutiny of a neutral magistrate," rather than the "hurried

11

judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime." *Id.* at 913-14 (internal quotes and citation omitted). The magnitude of the gratuitous benefit conferred on guilty defendants by the exclusionary rule when police officers have acted in good faith to obtain a warrant "offends basic concepts of the criminal justice system" and imposes substantial costs on society. *Id.* at 908. Suppression is necessary "only if the officers were dishonest or reckless in preparing their affidavit [or testimony] or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926.

Under the *Leon* good faith exception, evidence seized by an officer acting pursuant to a warrant is admissible unless: (1) the officer misled the magistrate or judge with information that he "knew was false or would have known was false except for his reckless disregard of the truth"; (2) the issuing magistrate "wholly abandoned his judicial role"; (3) the evidence supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 923 (internal quotes and citation omitted); *see also, Unites States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (explaining the *Leon* good faith exception).

None of these four narrow exceptions applies here. The facts established at the hearing show that Inv. Caldwell first sought an arrest warrant for Allen on June 4, 2019, the day after the robbery. At that time, Caldwell had only Trammell's statement that Pierce

told him that he and Allen committed the robbery. Chief Magistrate May told Caldwell that Trammell's statement alone was not enough to establish probable cause to arrest Allen. When Inv. Caldwell obtained Deshun's statement implicating Allen on June 20, 2019, he returned to May on July 1, 2019. Chief Magistrate May determined that this additional evidence, considered along with Trammell's statement and the totality of the circumstances surrounding the investigation, was sufficient to establish probable cause. Accordingly, Chief Magistrate May issued the complaints and warrants.

     These facts conclusively show that Inv. Caldwell was acting in objective good faith on the warrants when he arrested Allen. There is no evidence that Inv. Caldwell lied to or misled the magistrate in any way. Rather, Inv. Caldwell presented the limited evidence he had and gathered additional evidence implicating Allen when the magistrate denied his initial warrant application. Chief Magistrate May's denial of the initial warrant application shows that he was acting as a detached and neutral judicial officer and not simply as a rubber stamp for the police when he issued the warrants. Caldwell believed that he had probable cause on June 4, 2019, so there was absolutely no reason for him to question the magistrate's finding of probable cause when he presented additional evidence implicating Allen on July 1, 2019. Finally, the arrest warrants are not facially defective; they clearly identify Allen and the charges against him. Under these circumstances, even if the warrants for Allen lacked probable cause, the *Leon* good faith exception applies, and the firearm seized from Allen incident to arrest and his subsequent incriminating statement will not be excluded.

## IV. CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Allen's Motion to Suppress (Doc. 24) be DENIED. It is further

ORDERED that the parties shall file any objections to this Recommendation on or before December 18, 2020. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1. *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 4th day of December, 2020.

Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE